## MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT
## SENTENCE BY A PERSON IN FEDERAL CUSTODY

| United States District Court | District | Eastern District of Missouri | |
|---|---|---|---|
| Name (under which you were convicted):<br>Dennis Dinwiddie | | | Docket or Case No.: |
| Place of Confinement:<br>USP Terre Haute | | Prisoner No.:<br>07504-033 | |
| UNITED STATES OF AMERICA | | Movant (include name under which you were convicted) | |
| v. | | DENNIS DINWIDDIE | |

### MOTION

1. (a) Name and location of court that entered the judgment of conviction you are challenging:

   United States District Court for the Eastern District of Missouri, Southeastern Division


   (b) Criminal docket or case number (if you know):  1:06-CR-00134

2. (a) Date of the judgment of conviction (if you know):  5/6/2009


   (b) Date of sentencing:  5/6/2009

3. Length of sentence:  LIFE

4. Nature of crime (all counts):

   Count One: conspiracy to distribute and possess with intent to distribute 50 kilograms or more of marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 846. Count Two: interstate travel or transportation in aid of a racketeering enterprise in violation of 18 U.S.C. §§ 1952(a)(2) and 2. Count Three: possession of a firearm in furtherance of a drug trafficking crime resulting in a murder in violation of 18 U.S.C. § 924(c)(1) and § 924(j)(1). Count Four: being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(e).


5. (a) What was your plea? (Check one)

   (1)   Not guilty ☑        (2)   Guilty ☐        (3)   Nolo contendere (no contest) ☐

   (b) If you entered a guilty plea to one count or indictment, and a not guilty plea to another count

   or indictment, what did you plead guilty to and what did you plead not guilty to?

   N/A




6. If you went to trial, what kind of trial did you have? (Check one)        Jury ☑        Judge only ☐

7. Did you testify at a pretrial hearing, trial, or post-trial hearing?        Yes ☐        No ☑

8. Did you appeal from the judgment of conviction?        Yes ☑        No ☐

9. If you did appeal, answer the following:

   (a) Name of court:   United States Court of Appeals for the Eighth Circuit

   (b) Docket or case number (if you know):   09-2154

   (c) Result:   Lower court affirmed; petition for rehearing and rehearing en banc denied.

   (d) Date of result (if you know):   1/20/2010

   (e) Citation to the case (if you know):   United States v. Dinwiddie, 618 F.3d 821 (8th Cir. 2010)

   (f) Grounds raised:

   (1) the district court erred in denying Mr. Dinwiddie's motion to suppress evidence, as the police exceeded the scope of consent given when searching him and unlawfully seized him; (2) the district court erred in allowing hearsay testimony implicating Mr. Dinwiddie on a finding the testimony was admissible coconspirator statements; (3) the evidence was insufficient to support the conviction for a Travel Act violation ; (4) the district court erred in finding that the prior Kentucky convictions for facilitation to robbery and facilitation to kidnapping were countable as violent crimes for the purposes of the Armed Career Criminal Act; and (5) the district court erred by sentencing Mr. Dinwiddie to a consecutive life sentence under 18 U.S.C. § 924(j).

   (g) Did you file a petition for certiorari in the United States Supreme Court?        Yes ☑   No ☐

      If "Yes," answer the following:

      (1) Docket or case number (if you know):   10-8712

      (2) Result:

       Petition for writ of certiorari denied

      (3) Date of result (if you know):   2/28/2011

      (4) Citation to the case (if you know):   Dinwiddie v. United States, No. 10-8712

      (5) Grounds raised:

       Mr. Dinwiddie's sentence for the 18 U.S.C. § 924(c)(1)(A) conviction should not have been run consecutive to the sentence under 18 U.S.C. § 924(c)(1) under the intended meaning and operation of § 924(c).

10. Other than the direct appeals listed above, have you previously filed any other motions, petitions, or applications concerning this judgment of conviction in any court?

      Yes ☐   No ☑

11. If your answer to Question 10 was "Yes," give the following information:

    (a) (1) Name of court:   N/A

       (2) Docket or case number (if you know):

       (3) Date of filing (if you know):

(4) Nature of the proceeding:

(5) Grounds raised:

(6) Did you receive a hearing where evidence was given on your motion, petition, or application? Yes ❑ No ❑

(7) Result:

(8) Date of result (if you know):

(b) If you filed any second motion, petition, or application, give the same information:

(1) Name of court:

(2) Docket or case number (if you know):

(3) Date of filing (if you know):

(4) Nature of the proceeding:

(5) Grounds raised:

(6) Did you receive a hearing where evidence was given on your motion, petition, or application? Yes ❑ No ❑

(7) Result:

(8) Date of result (if you know):

(c) Did you appeal to a federal appellate court having jurisdiction over the action taken on your motion, petition, or application?

(1) First petition: Yes ❑ No ❑

(2) Second petition: Yes ❑ No ❑

(d) If you did not appeal from the action on any motion, petition, or application, explain briefly why you did not:

12. For this motion, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the <u>facts</u> supporting each ground.

### GROUND ONE:

Mr. Dinwiddie was deprived of his rights to due process, fair trial, and effective assistance of counsel

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

when testimony and other evidence testimony was not introduced at trial to demonstrate that Mr. Dinwiddie was not guilty of a conspiracy to distribute 50 kilograms or more of marijuana, as charged in Count One, and did not possess a firearm in connection with a drug trafficking crime, as charged in Count Three.

FACTS: Detective Tim Anderson acknowledged that the 50 pounds of marijuana delivered to Barbara Dinwiddie's residence on January 26, 2006 were not Mr. Dinwiddie's, and this statement was recorded on tape. Witnesses, including Barbara and Carolyn Dinwiddie were present and available to testify at trial that Mr. Dinwiddie was not aware of the 50-pound delivery. This evidence was not presented at trial, either because it was not available or because of the ineffective assistance of counsel. A reasonable probability exists that, had this evidence been available, or but for counsel's failure to present this evidence, the jury would have acquitted Mr. Dinwiddie on Counts One and Three, or the federal courts would have found the evidence was insufficient to support the convictions on Counts One and Three.

(b) Direct Appeal of Ground One:

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐   No ☑

(2) If you did not raise this issue in your direct appeal, explain why:

This claim is based on new, previously unavailable evidence or ineffective assistance of counsel that Mr. Dinwiddie did not need to raise on appeal to preserve it. See Massaro v. United States.

(c) Post-Conviction Proceedings:

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐   No ☑

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:   N/A

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):


(3) Did you receive a hearing on your motion, petition, or application?

   Yes ❑   No ❑

(4) Did you appeal from the denial of your motion, petition, or application?

   Yes ❑   No ❑

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

   Yes ❑   No ❑

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:


Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):


(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:




**GROUND TWO:**

 Mr. Dinwiddie was deprived of his rights to due process, fair trial, and effective assistance of counsel

(a)  Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

when testimony and other evidence testimony was not introduced at trial to demonstrate that, while Mr.
Dinwiddie possessed a firearm on April 22, 2006, he did not possess that firearm in connection with
any drug trafficking crime, as charged in Count Three.

FACTS: Although witnesses were correct that Mr. Dinwiddie possessed a weapon on April 22, 2006,
he did not possess that weapon with any connection to any drug crime. Additional evidence to support
this fact was not presented at trial, either because it was not available or because of the ineffective
assistance of counsel. A reasonable probability exists that, had this evidence been available, or but for
counsel's failure to present this evidence, the jury would have acquitted Mr. Dinwiddie on Count Three,
or the federal courts would have found the evidence was insufficient to support the conviction on Count
Three.

(b) **Direct Appeal of Ground Two:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ❑   No ❑

(2) If you did not raise this issue in your direct appeal, explain why:

This claim is based on new, previously unavailable evidence or ineffective assistance of counsel that Mr. Dinwiddie did not need to raise on appeal to preserve it.  See Massaro v. United States.

(c) **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ❑   No ☑

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:  N/A

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

Yes ❑   No ❑

(4) Did you appeal from the denial of your motion, petition, or application?

Yes ❑   No ❑

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes ❑   No ❑

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND THREE:**

Mr. Dinwiddie was deprived of his rights to due process, fair trial, and effective assistance of counsel

(a)  Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

when testimony and other evidence testimony was not introduced at trial to demonstrate that, while Mr. Dinwiddie possessed a firearm on April 22, 2006, that firearm was not used to cause the death of Sergio Burgos.

FACTS: Although witnesses were correct that Mr. Dinwiddie possessed a weapon on April 22, 2006, that particular firearm was not used to cause the death of Sergio Burgos. Additional evidence to support this fact was not presented at trial, either because it was not available or because of the ineffective assistance of counsel. A reasonable probability exists that, had this evidence been available, or but for counsel's failure to present this evidence, the jury would have acquitted Mr. Dinwiddie on Count Three, or the federal courts would have found the evidence was insufficient to support the conviction on Count Three.

(b) **Direct Appeal of Ground Three:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ❑   No ☑

(2) If you did not raise this issue in your direct appeal, explain why:

This claim is based on new, previously unavailable evidence or ineffective assistance of counsel that Mr. Dinwiddie did not need to raise on appeal to preserve it.  See Massaro v. United States.

(c) **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ❑   No ☑

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition: N/A

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

Yes ❏   No ❏

(4) Did you appeal from the denial of your motion, petition, or application?

Yes ❏   No ❏

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes ❏   No ❏

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND FOUR:**

Mr. Dinwiddie was deprived of his rights to due process, fair trial, and effective assistance of counsel

(a)  Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

when testimony and other evidence testimony was not introduced at trial to demonstrate that, while Mr. Dinwiddie possessed a firearm on April 22, 2006, if that firearm was used in any way to cause the death of Sergio Burgos, Mr. Dinwiddie did not act with malice aforethought or in a way for the jury to infer malice aforethought.

FACTS: Although witnesses were correct that Mr. Dinwiddie possessed a weapon on April 22, 2006, that Mr. Dinwiddie did not use it with malice aforethought, recklessly, wantonly, in a gross deviation from the standard of car, or with an awareness of the serious risk of the death of Sergio Burgos. Additional evidence to support these facts were not presented at trial, either because it was not available or because of the ineffective assistance of counsel. A reasonable probability exists that, had this evidence been available, or but for counsel's failure to present this evidence, the jury would have acquitted Mr. Dinwiddie on Count Three, or the federal courts would have found the evidence was insufficient to support the conviction on Count Three.

(b) **Direct Appeal of Ground Four:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ❑   No ☑

(2) If you did not raise this issue in your direct appeal, explain why:

This claim is based on new, previously unavailable evidence or ineffective assistance of counsel that Mr. Dinwiddie did not need to raise on appeal to preserve it. See Massaro v. United States.

(c) **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ❑   No ☑

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

Yes ❑   No ❑

(4) Did you appeal from the denial of your motion, petition, or application?

Yes ❑   No ❑

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes ❑   No ❑

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

13. Is there any ground in this motion that you have <u>not</u> previously presented in some federal court? If so, which ground or grounds have not been presented, and state your reasons for not presenting them:

No argument raised in this motion was previously raised, and cause and prejudice is shown for each claim, either because the issue is based upon prejudicial ineffective assistance of counsel or because the issue is based upon in part based upon evidence not previously introduced into the record by prior counsel.

14. Do you have any motion, petition, or appeal <u>now pending</u> (filed and not decided yet) in any court for the judgment you are challenging?      Yes ❑   No ✔
If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised.

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At preliminary hearing:

Kevin L. Schriender

(b) At arraignment and plea:

Jennifer Herndon and Michael J. Gorla

(c) At trial:

Jennifer Herndon and Michael J. Gorla

(d) At sentencing:

Jennifer Herndon and Michael J. Gorla

(e) On appeal:

Jennifer Herndon and Michael J. Gorla

(f) In any post-conviction proceeding:

N/A

(g) On appeal from any ruling against you in a post-conviction proceeding:

N/A

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?      Yes ☑ No ☐

17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?      Yes ☐ No ☑

(a)  If so, give name and location of court that imposed the other sentence you will serve in the future:  N/A

(b) Give the date the other sentence was imposed:

(c) Give the length of the other sentence:

(d) Have you filed, or do you plan to file, any motion, petition, or application that challenges the judgment or sentence to be served in the future?   Yes ☐  No ☐

18. TIMELINESS OF MOTION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2255 does not bar your motion.*

Mr. Dinwiddie is filing this motion within one year of the date his conviction became final.

---

\* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2255, paragraph 6, provides in part that:

A one-year period of limitation shall apply to a motion under this section. The limitation period shall run from the latest of —

(1) the date on which the judgment of conviction became final;

(2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making such a motion by such governmental action;

(3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

Therefore, movant asks that the Court grant the following relief:

> Mr. Dinwiddie asks the Court to vacate his convictions on Counts One and Three to correct the constitutional errors in this case.

or any other relief to which movant may be entitled.

_____

Signature of Attorney (if any)


I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Motion under 28 U.S.C. § 2255 was placed in the prison mailing system on

⟶ (month, date, year).

Executed (signed) on _____2/14/12_____ (date).

_____

Signature of Movant


If the person signing is not movant, state relationship to movant and explain why movant is not signing this motion.



## AFFIDAVIT OF DENNIS DINWIDDIE

Affiant Dennis Dinwiddie, having been duly cautioned and sworn, hereby states the following:

1.  I, Dennis Dinwiddie, am the defendant in the case United States v. Dennis Dinwiddie, 1:06-CR-00134-02 and the movant in the pending motion under 28 U.S.C. § 2255, an inmate at FCI Terre Haute, and I have first-hand knowledge of the facts that follow. Although some specific dates and specific words may be difficult for me to remember, I certainly remember the following facts regarding my case.

2.  On the morning of January 26, 2006, I was at my rim shop. I left work and went to a female's house. I later stopped at the house of my sister, Barbara Dinwiddie. As she and I were talking in the house, I noticed two boxes in her living room. I asked her what she had delivered, and she told me "Nothing. The Fed Ex people just brung it to my door so I took it." She and I went back and forth about why she got this delivery.

3.  I asked Barbara for the label, she gave it to me, and I left. I went back to my shop, typed in the number online, and I saw where the packages came from.

4.  I called my sister Barbara and asked where her husband (my brother-in-law Larry Taylor) was. She told me Larry was at work. I went to Larry's job and spoke to him briefly about the boxes. I asked him if he knew about them. He told me he would

1



talk to me when he left work because he did not what to get fired.

5. I left and called my mother to ask her if she would cook lunch. She said she would. I went back to shop but later left for lunch and went to my mothers house. When I got to her place, she was not there. So I called my mother's phone, and she did not pick up.

6. At about that time, I got a call from a worker at my rim shop. He said that the police were there looking for me, I told him I was on my way. I left the house and kept trying to call my mother and my sister and they never answered.

7. On my way back to the rim shop I stopped back over my sister Barbara's house, and the police ran up to me. They first asked my name then they questioned me about weapons and drugs being on my person. I said, "No." They patted me down and took me into my sister's house. My mother, brother and sister were in the living room.

8. Detective Tim Anderson came and told the other police to bring me in the back of the house. They took me to my sister Barbara's bedroom and asked if I knew what was in the boxes. I answered, "No," because I did not really know for sure even though I had my suspicions. Anderson said that my sister had 50 pounds of marijuana in her room.

2



9.   The police asked why I had been there at Barbara's home earlier in the day and left. I told them because this was my sister's house, and I often come to check on her.

10.  As I was speaking, Mike Giles, my business partner at the rim shop called me. He said, "The police was at the shop looking for you." I told him that I knew, and that the police were talking to me at that moment.

11.  The police asked whether the call I had just received from Mike Giles was from someone warning me. I said, "No, it was my co-worker." The police then took my phone.

12.  That was when Anderson began to question me. I never told Anderson I knew where the marijuana was from. But I did tell him I was going to find out.

13.  I asked Anderson whether he spoke to my brother-in-law Larry. Anderson answered, No, he did not know Larry. I told Anderson that Larry was the "man of the house."

14.  Anderson said he is going to lock my mother, brother and sister up. But he said that if I could talk to my sister and find out where the marijuana came from he would let my family go. He explained that the police just wanted the owner of the marijuana. I told him I would talk to my sister.

15.  Anderson took me in living room and asked me to call Larry. I grabbed one of the phones on counter after I asked my sister Barbara for Larry's number. One of the police officers handed

3

me my phone back so I could make the call. Anderson pulled me to the side and said something like, "It is a good deed you are doing for your family" by calling. Anderson told me he would call me later and he would need to know the owner of the boxes.

16. Later I spoke with Larry, and he apologized. Larry said that Sergio Burgos's associate Mike Meador paid Larry some money to find addresses to send drugs. Larry said he thought he gave Mike Meador the address next door because no one lived there and they said no one had to sign anything.

17. When Anderson later called me, I told Anderson everything (but that I did not know Sergio's last name at that time). Anderson told me to get in touch with Sergio or to call Anderson if Sergio come to my rim shop. I said, "Sergio don't come to my shop like that, and a lot of times he will call, tell me what he needs, I will order it and he will send someone or come himself."

18. Anderson called back later that night and had me drive to a old shipping yard or garbage disposal yard or something like that. I don't remember what it was, but I remember where it was. I allowed him to know I got Sergio's direct connect number now and I can talk to Sergio about that. Anderson asked me to make that call to see what Sergio says about the boxes.

4



19. I called Sergio, Sergio picked up and asked who was calling. I said, "It's Dennis at the shop." Sergio asked what happened at my sister house and where was Larry. I told Sergio that I didn't know where Larry was. I asked Sergio what was up with him and Larry. Sergio said, "Nothing," and that Larry just "needed a couple dollars."

20. I left it as that. As I was going to hang up, Anderson whispered and said, "Ask about the boxes." I did, and Sergio said his cousin "sent Larry something." I asked Sergio what it was. Sergio did not say anything at first. Then he said "Green." When the police heard that, Anderson gave a high-five to some police officer who was with him.

21. Anderson told me that he needed my help to get Sergio. I said "I did what you asked me, I can't do that." This is when everything changed between me and Anderson. He now was threatening to arrest me. He told me to sleep on it, because he knew I was on parole.

22. I went home that night, then I left for four days and spent time with my daughter. Anderson kept trying to call me. I told my dad that Anderson kept calling me. My dad suggested that I get a recorder and record Anderson.

23. The next time Anderson called, I agreed to meet him, and recorded the conversation. I told Anderson I felt he was coercing me to set someone up I don't know. Anderson said that

5

D.D.

he knew the drugs were not mine. This was recorded on tape. When I said the drugs were not mine, he said, "Yeah, I know, but I believe you know more that you aren't telling me."

24. Three days later, Sergio sent his nephew Mario to my shop looking for Larry. I told Sergio's nephew, "Tell Sergio don't ever come back," and I explained why. They left.

25. After that, I never saw or spoke to Sergio again. Sergio never took money from me.

26. Later, Lawan James came to Tennessee. He was having issues with his fiancé. He asked my mother to stay, and she said it was okay.

27. Around three months later, Mike Meador called me wanting to sell one of the cars he got through us. The car was a Lincoln. But I explained to Mike Meador that the guy who sold it to him was not here anymore, and I allowed him to talk to Lawan because Lawan was trying to get a car so his fiancé and him both will have one.

28. Some days later, Mike Meador called me looking for Lawan. But Lawan was gone at the time. He had gone back to Indiana to try to work things out with his fiancé.

29. The next day was April 22, 2006. Lawan came back and called me. I told him Mike Meador was looking for him to sell the car to Lawan. Lawan asked me where I was, and I told him that I was layed up with Oshena. Lawan got his family issues settled

6



and came to Oshena's house. He said he was going to go see Mike Meador about the Lincoln and that he would be back. We spoke for several minutes and I gave him my keys so his fiancé could go out if she wanted to while he was gone.

30. I went back into the house and had sex with Oshena and washed up to go to the shop. I had to open a little early because we had to get ready for a local radio station to come and setup at the shop for the day. Oshena took me to my shop, I opened and set everything up.

31. Then my mechanic Eric Tharpe came by and we talked. I told him about the Lincoln and what Mike Meador was trying to sell it for. He took interest and wanted to see it. But Lawan had already left that same morning to get the Lincoln from Mike Meador.

32. Eric got in touch with Lawan and told him he wanted to see the car and check the engine before he bought it. Lawan was already too far away, so me and Eric decided to go to check out the engine and car to see if it was worth it. I knew that Lawan was already ahead of us and that he would get to Mike Meador's place and see the Lincoln first.

33. Eric and me could not leave until somebody came to watch the shop for me while I was gone. When my detailer (a guy from Memphis named Dave) and Mike Giles got to the shop we left.

7

*D.D.*

34. I had a car hauler at the rip shop. Eric and I got into Eric's dodge durango, and I attached the car hauler on the back. We headed out to Missouri to see Mike Meador and to get the Lincoln and bring it back.

35. When we got to Missouri everything was wrong. The atmosphere of everything and the way people was moving. When me and Eric pulled up at Mike Meador's house. Mike Meador was out front cleaning up stuff. I got out and talked with him.

36. I found out everything that Mike Meador knew. It turned out that Mike Meador was cleaning up after there had been a shooting. Mike Meador and I got into an argument. Mike Meador told me that Sergio was there, and that Lawan showed up, that Lawan and Sergio got into an argument about counterfeit money that Lawan was trying to spend.

37. Mike Meador was upset with me, thinking I knew what Lawan was going to do. Mike Meador kept telling me to take Lawan's car (the Mitsubishi) and leave. Mike Meador told me that Lawan was with Raul dumping Sergio's body.

38. Eric drove the truck and trailer. I got in the Mitsubishi, and we left. I called Lawan, but he did not pick up, I called Mike, but he did not pick up. I then kept calling Lawwan, and he finally picked up, we decided to meet up at the gas station. We did, I met Raul, and he left.

8

*D.P.*

39. Me and Lawan talked and he told me everything. He told me about the counterfeit money, that he tried to use on Mike Meador and Sergio realized it was counterfeit money, and the argument he had with Sergio over that. Lawan said he fought with Sergio and admitted that he (Lawan) shot and killed Sergio. Lawan said that Sergio tried to reach for a weapon, and that is when Lawan shot him.

40. We decided to tell Eric to leave. I filled up the gas at the gas station. Eric went one way, and me and Lawan  went to Mike Meador's house because Lawan was making sure that he didn't leave anything at the scene. We left.

41. I was in Missouri on April 22, 2006. I had a 38 caliber revolver with me that day. But I did not have it to kill anyone, and I did not see Sergio to even have a chance to hurt him. I never fired that gun, and though I told Sergio nephew to never come back and to tell Sergio, we did not argue or anything. They did think I was an informant, but I found this out later.

42. Mike Meador saw me with the gun that day. But I was not present when Lawan and Sergio got into an argument. I did not kill Sergio. I did not want him to be killed, I did not send Lawan to confront or kill Sergio, and I had no intention for Sergio to be harmed. Sergio never took money from me, and I had no reason for Sergio to be harmed. I showed up at Mike

9

D.D.

Meador's place after Lawan and Sergio argued, after Lawan killed Sergio and after Lawan took Sergio's body away.

43. Me and Mike Meador did not sell drugs with each other. The extent of my relationship with Sergio and Mike Meador revolved around my rim shop. They came and visited there.

44. There is no question I was raised in the streets, and I knew who was who and how others live. But by this time of my life, my new "drug" of choice was rims and music. I did have nights at the rim shop where I would open after hours and people would come gamble most of the night and into the early morning hours. Sergio would be there, and a lot of people became acquainted with Sergio that way. Sergio had no problem spending his money at the shop, including on gambling, and I had no problem taking it. I met Mike Meador at the shop, he use to come and get his truck detailed.

Further Affiant sayeth naught.

Pursuant to 28 U.S.C. 1746, I, Dennis Dinwiddie, declare under penalty of perjury that the foregoing is true and correct. Executed on this _10TH_ day of _FEBUARY_ 2012.

_D. Dinwiddie_
Dennis Dinwiddie

10