UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| DENNIS DINWIDDIE, | ) |
| | ) |
| Movant, | ) |
| | ) |
| vs. | ) Case No. 1:12CV33 CDP |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Respondent. | ) |

# **MEMORANDUM AND ORDER**

Movant Dennis Dinwiddie is currently incarcerated at the Terra Haute Federal Correctional Complex in Terra Haute, Indiana. A jury convicted Dinwiddie on four counts related to a conspiracy to distribute marijuana and the murder of Sergio Burgos. This matter is before me on Dinwiddie's motion to vacate, set aside, or correct sentence under 28 U.S.C. Section 2255. Dinwiddie alleges several grounds for relief, including a claim that he was deprived of his right to testify at trial. I held an evidentiary hearing on that claim. The remaining grounds for relief each allege failure by trial counsel to introduce evidence that would establish Dinwiddie's innocence of the various crimes for which he was convicted.

Based on the evidence, the arguments of counsel, and the briefs filed on the § 2255 motion, I conclude that Dinwiddie's motion is meritless. The evidence

indicates that Dinwiddie was aware of his constitutional right to testify at trial, but that he followed the prudent advice of his counsel and declined to exercise that right. In addition, because the evidence against him is overwhelming and because the uncalled witnesses would have been subject to impeachment, Dinwiddie was not prejudiced by his counsel's other alleged failures. The motion will be denied.

## I. Background

### I.A. Procedural History

Following a four-day jury trial, Dinwiddie was convicted of conspiracy to distribute marijuana in excess of 50 kilograms (Count I), a Travel Act[1] violation resulting in death (Count II), possession of a firearm in furtherance of a drug trafficking crime that resulted in murder (Count III), and being a felon in possession of a firearm (Count IV). I sentenced him to incarceration terms of 360 months on Count I and life on Counts II and IV, to be served concurrently. I also sentenced Dinwiddie to life imprisonment on Count III, to be served consecutively to the other counts.[2] The Court of Appeals for the Eighth Circuit affirmed his conviction and sentence on August 25, 2010. *United States v. Dinwiddie*, 618 F.3d 821 (8th Cir. 2010). Dinwiddie then filed his § 2255 motion.

On August 19, 2014, I held a hearing to receive evidence as to whether Dinwiddie knew of his constitutional right to testify. Dinwiddie appeared with

---
[1] 18 U.S.C. § 1952(a).
[2] Criminal Case No. 4:06-CR-134-CDP-2.

privately retained counsel for the hearing, where he testified and elicited testimony in support of his claim. The government offered the testimony of one of Dinwiddie's trial attorneys.

I.B.  Factual Background

Dennis Dinwiddie and Michael Meador were convicted in separate trials of conspiracy to distribute marijuana that resulted in the murder of Sergio Burgos. Their appeals were consolidated, and the Eighth Circuit set forth the facts supporting their respective convictions:

> Sergio Burgos Gonzales (Burgos) was part of a conspiracy to distribute marijuana with Dinwiddie and Meador. Burgos shipped marijuana from Texas via express mail services to Dinwiddie in Tennessee and Meador in Missouri. After the marijuana was distributed, Burgos visited Dinwiddie and Meador to collect payment.
>
> On January 25, 2006, Burgos shipped approximately fifty pounds of marijuana to Dinwiddie. Police intercepted the shipment and made a controlled delivery in Clarksville, Tennessee, while surveilling the residence to which the delivery was made. Police observed Dinwiddie outside of the residence, holding what appeared to be a packing slip from the delivery. Police approached him, asking him if he possessed any weapons or drugs. Dinwiddie said no and consented to a search of his person and vehicle. During the search, police recovered from Dinwiddie's pants pocket a packing slip from one of the packages in the shipment that had just been delivered. When asked about his involvement in the shipment, Dinwiddie stated that he was a middleman for Burgos. Police confiscated the marijuana, but did not make any arrests.
>
> Less than a week later, Dinwiddie, Meador, and Burgos met in Tennessee at which time they concocted a plan wherein Meador would travel to Texas with Burgos to purchase more marijuana. Dinwiddie provided Meador with $10,000 for the transaction. During

- 3 -

the trip, Burgos expressed anger at Dinwiddie and speculated that Dinwiddie might have stolen the drugs that were seized as a result of the controlled delivery. In Texas, Meador gave Burgos the $10,000 to purchase marijuana and Burgos took the money, promising to do so. Burgos, however, did not return with the marijuana.

Meador informed Dinwiddie that Burgos had left with the money and failed to return with the drugs as planned. Meador traveled to Tennessee and was picked up by Dinwiddie in Memphis. As they drove together to Clarksville, Dinwiddie expressed anger at Burgos. Meador indicated that he could locate Burgos and agreed to arrange a future meeting between Dinwiddie and Burgos. After returning to Missouri, Meador spoke with Burgos and told him that they could continue doing business without Dinwiddie. In March 2006, Burgos shipped a package of marijuana to Meador in Missouri. Shortly thereafter, Burgos met Meador to collect his payment. Looking forward, they agreed that Burgos would personally bring 200 pounds – a larger than normal amount – of marijuana to Meador in April.

On April 21, 2006, Burgos arrived at Meador's grandmother's house in New Madrid, Missouri, with 200 pounds of marijuana, accompanied by an associate, Raul Cruz. Meador and Michael Jeremy Hunt, an associate of Meador's, immediately began preparing the marijuana for distribution to local customers and began distribution that night, collecting $40,000. The plan was for Burgos to return to the house the following morning to receive payment for the marijuana. Meador called Dinwiddie to tell him that Burgos was in Missouri. Dinwiddie acquired a .45 caliber handgun from his girlfriend, Genalle Brown; recruited Lawan James, an old friend, to accompany him; and proceeded to New Madrid.

When Dinwiddie met Meador in New Madrid, they discussed the February 2006 incident in which Burgos absconded with Dinwiddie's $10,000. Meador encouraged Dinwiddie to confront Burgos. Meador and Dinwiddie then drove to the hotel at which Burgos was staying. Meador cautioned Dinwiddie not to confront Burgos at the hotel because of the risk that Burgos might escape. Dinwiddie complied and returned to Meador's grandmother's house, where, at Meador's direction, he concealed his car behind the house to

hide it from Burgos's sight.  At Dinwiddie's request, Meador retrieved his grandmother's .32 caliber handgun and gave it to James.

When Burgos and Cruz approached the house the following morning, Meador directed Dinwiddie, James, and Hunt to hide so that Burgos would not flee at the sight of them.  Meador and Hunt hid in the bathroom.  When Burgos entered the house, he called for Meador.  Dinwiddie confronted Burgos, pistol-whipped him, and forced him into the bedroom, where Dinwiddie demanded to know where the $10,000 was and why Burgos had disappeared with the money.  Burgos said that he had acted out of fear, that his cousin Mario had made off with money, and that it could not be returned.  An argument ensued between Dinwiddie and Burgos about the intercepted drug shipment.

Dinwiddie asked Burgos if he had called him a "bitch," as Meador had related.  Dinwiddie then shot Burgos once in the groin.  Burgos beseeched Dinwiddie to spare his life.  According to James, Dinwiddie replied, "Who's a bitch now?," and shot Burgos again, this time in the head.  Dinwiddie then ordered James to shoot Burgos.  James, using the .32 caliber handgun provided by Meador, shot Burgos once in the back.

Frightened by the commotion, Meador and Hunt broke out of the bathroom window and retrieved guns from a neighboring house.  Meador acquired a shotgun and Hunt picked up a carbine.  Meador directed Hunt to keep the carbine trained on Dinwiddie when he exited the house.  Meador told Hunt to shoot Dinwiddie if he made an aggressive move.  Dinwiddie and Meador spoke and the guns were put down.

At Dinwiddie's direction, James and Cruz loaded Burgos's body into Burgos's car.  Dinwiddie, James, and Cruz drove to a nearby location and discarded Burgos's body in a road-side ditch.  Meador and Hunt cleaned up the room in which Burgos had been murdered, burning bloody linens and Burgos's and Cruz's cell phones.  Dinwiddie gave some of Burgos's marijuana to James and Meador gave some of Burgos's marijuana to Hunt.  Meador told Hunt to lay low for a while and that they could resume the marijuana business with Dinwiddie in the future.  Dinwiddie and James

discarded the handguns by throwing them out the window while driving back to Tennessee. During this ride, James asked Dinwiddie about Dinwiddie's order to shoot Burgos. According to James, Dinwiddie replied, "Everybody had to play their part."

Burgos's body was found by police shortly after it was discarded. Police connected Burgos to Dinwiddie based upon a report filed by the Texas Department of Public Safety regarding the intercepted drug shipment in January. Investigators located Hunt at his sister's house in Dyersburg, Tennessee. Hunt, fearful for his life, spoke candidly to police about the murder and identified Dinwiddie as one of the perpetrators. Shortly thereafter, Meador learned that Hunt had spoken to police. Meador then went to police in St. Genevieve, Missouri, to talk about the murder. Meador was less than candid, telling police that a group of unknown Haitians had murdered Burgos and denying any personal association with the killers.

Upon being arrested, James cooperated with investigators and explained what had happened in New Madrid. He led police to the area in Missouri where he and Dinwiddie had discarded the handguns used to kill Burgos. After a multi-day search, police recovered a .45 caliber handgun. Subsequent forensic analysis matched a .45 caliber shell found at the murder scene to the recovered handgun. Police obtained a search warrant for Dinwiddie's residence and an arrest warrant for Dinwiddie. At Dinwiddie's residence, police recovered a pair of blue jeans with blood stains and an April 22, 2006, receipt for gas from a truck stop in Missouri.

*Dinwiddie*, 618 F.3d at 827–29.

## II. <u>Legal Standards</u>

Under 28 U.S.C. § 2255, a federal prisoner may seek relief on the ground that "the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise

subject to collateral attack. . . ." 28 U.S.C. § 2255. Claims based on a federal statute or rule, rather than on a specific constitutional guarantee, can be raised "on collateral review only if the alleged error constituted a fundamental defect which inherently results in a complete miscarriage of justice." *Reed v. Farley*, 512 U.S. 339, 354 (1994) (quotations omitted). A motion pursuant to § 2255 "is 'intended to afford federal prisoners a remedy identical in scope to federal habeas corpus.'" *United States v. Wilson*, 997 F.2d 429, 431 (8th Cir. 1993) (quoting *Davis v. United States*, 417 U.S. 333, 343 (1974)).

To succeed on a claim of ineffective assistance of counsel, the litigant must prove (1) that counsel's performance was deficient in that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment" and (2) that counsel's "deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To prove *Strickland*'s first prong, deficient performance, a movant must demonstrate that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. When evaluating counsel's performance, a court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. In addition, the objective reasonableness of counsel's performance is assessed "in light of professional norms prevailing when

the representation took place." *Sinisterra v. United States*, 600 F.3d 900, 906 (8th Cir. 2010).

Even if sufficient proof exists with respect to the first prong, relief may only be obtained if a petitioner also proves that the deficient performance prejudiced the case (the second prong). *Strickland*, 466 U.S. at 697. A movant must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. This showing of a "reasonable probability" of a different outcome is less than a preponderance of the evidence but greater than just a possibility; it "is a probability sufficient to undermine confidence in the outcome." *Paul v. United States*, 534 F.3d 832, 837 (8th Cir. 2008). The Court may address the two *Strickland* prongs in any order, and if a petitioner fails to make a sufficient showing of one prong, the Court need not address the other prong. *See Strickland*, 466 U.S. at 697; *Fields v. United States*, 201 F.3d 1025, 1027 (8th Cir. 2000) ("If we can answer 'no' to either question, then we need not address the other part of the test.").

### III. <u>Discussion</u>

Dinwiddie formally raises four grounds for relief, each of which implicates his rights to due process and effective assistance of counsel. As his first ground, Dinwiddie alleges his defense counsel failed to introduce testimony that Dinwiddie was not guilty of conspiring to distribute marijuana in excess of 50 kilograms and

possession of a firearm in connection with a drug trafficking crime. Dinwiddie's second ground states that his counsel failed to introduce testimony to demonstrate that although Dinwiddie did possess a firearm on April 22, 2006, that possession was unconnected to a drug trafficking crime. The third ground for relief alleges failure to introduce testimony that the firearm possessed by Dinwiddie was not used to cause the death of Sergio Burgos. The fourth ground for relief states that Dinwiddie's counsel failed to introduce testimony that Dinwiddie did not act with the requisite *mens rea*, assuming Dinwiddie did possess a firearm and that firearm was used to cause the death of Sergio Burgos. Dinwiddie also informally raises a fifth ground – deprivation of his right to testify – that I will discuss first.

### III.A. Dinwiddie's Testimony

A defendant's right to testify in his own defense is guaranteed under the Due Process Clause of the Fourteenth Amendment, the Compulsory Process Clause of the Sixth Amendment, and the Fifth Amendment's privilege against self-incrimination. *See Rock v. Arkansas*, 483 U.S. 44, 51–53 (1987). "Because the right to testify is a fundamental constitutional guarantee, only the defendant is empowered to waive the right." *Frey v. Schuetzle*, 151 F.3d 893, 898 (8th Cir. 1998) (quoting *United States v. Bernloehr*, 833 F.2d 749, 751 (8th Cir. 1987). The waiver of this right must be made knowingly and voluntarily. *Id.* Voluntary waiver may be found where a defendant remains silent when his attorney rests

without having called the defendant to testify. *Id.* (citing *Bernloehr*, 833 F.2d at 751–52).

In the Government's response brief, it noted that Dinwiddie opted not to testify at trial. In reply, Dinwiddie stated that he had wanted to testify but was prohibited from doing so by his counsel. Because it was unclear from the record whether Dinwiddie knew of his right to testify and voluntarily waived that right, I held an evidentiary hearing on the issue.

At the hearing, Dinwiddie testified that he had numerous conversations with his counsel and that it was their joint intention, up to the close of defendant's evidence, that he would testify at trial. When he discovered that his counsel were refusing to call him to the stand, Dinwiddie became frustrated and it became necessary for his attorneys to ask his father, Grover Dinwiddie, to convince Dinwiddie not to testify. After Grover Dinwiddie returned to his seat, Dinwiddie again told his counsel that he wanted to testify, but he ultimately remained silent after the defense rested because he did not know he could say anything to the court and did not want to be "rude" in court. Dinwiddie further testified that he did not know he had a constitutional right to testify until he was notified of the evidentiary hearing in this § 2255 proceeding.

On cross-examination, the government contradicted Dinwiddie's present testimony with his second affidavit, in which Dinwiddie claimed that before trial,

- 10 -

he was told he could not testify: "That before trial and during trial when I told my trial counsels Michael Gorla and Jennifer Herndon that I wanted and needed to give testimony on my own behalf, I was told 'No! I didn't need to testify.'" ECF Doc. 15-2, ¶ 6.

One of Dinwiddie's trial attorneys testified for the government. He stated that he and his co-counsel had numerous conversations with Dinwiddie about whether he would testify, and they recommended before trial that Dinwiddie not testify, because

> Mr. Dinwiddie's record was not very good. There was a number of convictions that we thought put him in a bad light in front of the jury. . . . Another reason was that we had investigated what we believed his story to be, and we were unable to back it up, . . .

Evidentiary Hearing Transcript, p. 36–37. The trial counsel also testified that it is his general practice to advise his clients of their right to testify and that he was sure this topic arose during the course of his meetings with Dinwiddie. Finally, he recalled that at the close of evidence, he and his co-counsel recommended to Dinwiddie that he not testify and Dinwiddie concurred with their recommendation.

I find Dinwiddie's counsel to be credible. Based on the facts and arguments presented at the evidentiary hearing, I conclude that Dinwiddie was informed of his right to testify and deferred to his attorneys' recommendation not to testify.

III.B.  Grounds One through Four

Dinwiddie alleges that his constitutional rights were violated and his counsel was deficient for failing to introduce testimony showing that:

(1) "Mr. Dinwiddie was not guilty of a conspiracy to distribute 50 kilograms or more of marijuana, as charged in Count One, and did not possess a firearm in connection with a drug trafficking crime, as charged in Count Three."

(2) "[W]hile Mr. Dinwiddie possessed a firearm on April 22, 2006, he did not possess that firearm in connection with any drug trafficking crime, as charged in Count Three."

(3) "[W]hile Mr. Dinwiddie possessed a firearm on April 22, 2006, that particular firearm was not used to cause the death of Sergio Burgos."

(4) "[W]hile Mr. Dinwiddie possessed a firearm on April 22, 2006, if that firearm was used in any way to cause the death of Sergio Burgos, Mr. Dinwiddie did not act with malice aforethought or in a way for the jury to infer malice aforethought."

Dinwiddie supports these grounds with a recording made between himself and one of the investigating detectives as well as with affidavits of uncalled witnesses.

III.B.1.  *Dinwiddie's Recording*

Dinwiddie points to a recording he made of a conversation between himself and Detective Tim Anderson, who was one of the Tennessee police officers involved in intercepting and making the controlled delivery of fifty pounds of marijuana.  This recording was made some time after the January 25, 2006, interaction between Detective Anderson and Dinwiddie, a recording of which was

introduced at trial as Government's Exhibit 24. Exhibit 24 included a conversation between Dinwiddie and Sergio Burgos regarding marijuana shipped to Dinwiddie's sister and ultimately seized by the police. Dinwiddie contends that had the recording of his conversation with Detective Anderson been admitted into evidence, it would have impeached Anderson, because it shows that Anderson "believed the seized marijuana was not Mr. Dinwiddie's."[3] Dinwiddie says that his

---

[3] The transcript of this conversation was attached as an exhibit to Dinwiddie's reply brief. ECF Doc. 15-3. It included the following exchange:
        Dinwiddie:  You know, I (inaudible) Y'all basically know I ain't done anything.
        Det. Anderson:  Well . . . You kind of put yourself into it . . . .  Listen, listen.  If I, if I thought you were responsible for it, we wouldn't be talking.  We wouldn't be here right now.
        Dinwiddie:  I understand.  I'd probably be locked up.
        Det. Anderson:  Right.
        Dinwiddie:  And that's what, that's why I ain't understanding then.  Why is it that he got to be charged with (inaudible) when y'all know I ain't did anything, when y'all know I'm not responsible.
        Det. Anderson:  You're not responsible for the 50 pounds, but you are involved in the conspiracy conduct.
        Dinwiddie:  Well, well, my sister asked me to check out.
        Det. Anderson:  Because you knew what it was.
        Dinwiddie:  I didn't know what it was.  You seen that yesterday. . . .
        Det. Anderson:  You said yesterday, you know what Sergio done.  You knew the 25th that he was sending the boxes up here.
        Dinwiddie.  But I did not know what anything was.
        . . .
        Det. Anderson:  [W]ell, you told us before that [Dinwiddie interrupts] that you could make, you could talk to him and he would say how much it was and what it was.
        Dinwiddie:  Right.  I, I said I could talk to him and find out what was going on, what's in it, and that's, which is cool.  You know, I cooperate, and everything.  But . . . you all know that I don't have anything to do with it.  My sister will even tell y'all that I don't have anything to do with it.
        Det. Anderson:  Here's . . . part of my other thing.  You're still, I don't believe that you're still being 100% honest with us on everything that you know.
        . . .

recording was not admitted at trial "either because it was not available or because of the ineffective assistance of counsel."

Assuming the evidence was available, the decision not to introduce the recorded conversation was a strategic one. Counsels' "strategic choices made after thorough investigation of law and facts . . . are virtually unchallengeable[.]" *Strickland*, 466 U.S. at 690. "We presume attorneys provide effective assistance, and will not second-guess strategic decisions or exploit the benefits of hindsight." *Payne v. United States*, 78 F.3d 343, 345 (8th Cir. 1996).

Even had the conversation been admitted, there is little reason to believe that its admission would have changed the outcome. The unadmitted evidence must be considered alongside the evidence admitted at trial. *See McCauley-Bey v. Delo*, 97 F.3d 1104, 1106 (8th Cir. 1996) ("[T]he testimony of the uncalled witness is not considered in a vacuum."). Detective Anderson testified at length about his initial interaction with Dinwiddie. On that day, Dinwiddie told Detective Anderson that he knew "Sergio" was responsible for sending the packages, and agreed to

---

        Det. Anderson: In normal cases, your sister and you would have both been downtown yesterday in interviews in our office and, you know, writing out statement, and we would have been wrapping this thing up. But because you can help us put the dope back with the person who is responsible for sending it up here, we didn't do that.
        Dinwiddie: Okay, but just, let me know that y'all know that it's not mine.
        Det. Anderson: I don't believe that 50 pounds of dope is yours.
        Dinwiddie: Thank you.
        Det. Anderson: Alright? That's why you're here today and that's why that, you know, that I want you to help us. I do believe that you knew about it.

cooperate with the investigation.  Dinwiddie called Burgos using Dinwiddie's own phone, using a "direct connect" feature, similar to a two-way radio, which directly dialed the name in the phone's contact list.  Dinwiddie used the speaker feature on his phone so that Detective Anderson could listen to and record both sides of the conversation, and a transcript of that conversation was admitted into evidence.  Sergio referred to Dinwiddie by his first name, and after prompting by Detective Anderson, the two had a conversation about the contents of the packages:

> Dinwiddie: 10-4.  What's supposed to be, uh, the count on that box?
> Sergio: It will be fifty and a half total for both boxes.
> . . .
> Dinwiddie: [I]s it all green?
> Sergio: Yeah, 10-4.

At trial, Detective Anderson testified that the phrases "green" and "fifty and a half" meant that there was approximately 50.5 pounds of marijuana between the two boxes.

Detective Anderson's statement to Dinwiddie that he did not believe the marijuana was Dinwiddie's was made sometime after the January 25, 2006, exchange.  It occurred during the course of an open investigation, and it was made to Dinwiddie while Anderson was attempting to encourage his continued cooperation against Sergio Burgos.  Given that context – especially when combined with Detective Andersons's explicit statement that he believed

Dinwiddie was "involved in the conspiracy conduct" – the jury would likely have found that Detective Anderson remained credible.

Finally, there is no prejudice if the government's case remains overwhelming even after factoring in the unadmitted evidence. *United States v. Ramon-Rodriguez*, 492 F.3d 930, 945 (8th Cir. 2007); *McCauley-Bey*, 97 F.3d at 1106. The evidence of Dinwiddie's direct involvement with the shipment was bountiful. Dinwiddie appeared at the place of delivery, had the packing slip on his person, admitted he knew that Burgos sent the package, and direct dialed Burgos with a number already programmed into his own phone. Burgos referred to Dinwiddie by "Dennis," and was willing to discuss the contents of the package with Dinwiddie. As noted by the Eighth Circuit on appeal, the evidence of the drug conspiracy between Dinwiddie and Burgos was "overwhelming." *Dinwiddie*, 618 F.3d at 831. The evidence remains overwhelming, even when considering the content of the unadmitted recording between Dinwiddie and Detective Anderson. Dinwiddie cannot show that he was prejudiced by his counsel's failure to introduce the recording between him and Detective Anderson.

### III.B.2 *Affidavits*

Dinwiddie also cites the version of the facts presented in his own affidavits and the affidavits of his co-defendant, Michael Meador, and a colleague, Eric Tharpe, as testimony that should have been introduced by his counsel at trial. The

affidavits paint a different picture of the events surrounding Burgos's death and place the blame solely on Lawan James. They say that Dinwiddie and Tharpe followed James to Meador's house to assist James in the purchase of a car. When they arrived, James had already killed Burgos as part of a failed drug purchase of which they were not aware.

As discussed above, Dinwiddie voluntarily chose not to testify at trial based, in part, on advice of counsel. At the hearing, one of the defense attorneys testified as to some of the reasons why he recommended that Dinwiddie not testify. The attorney said that he had investigated elements of Dinwiddie's story and could not corroborate them. He also expressed concerns that Dinwiddie's criminal history would undermine their defense, which centered on the theme that the government witnesses should not be believed because of their own bad records and because they benefitted from their testimony against Dinwiddie.[4] Counsel's reasons for advising Dinwiddie not to testify show that the advice was reasonable trial strategy based on a professional evaluation of the case. Dinwiddie has not established that his attorneys' performance was deficient for failing to elicit his own testimony.

Dinwiddie alleges that his counsel was ineffective for failing to call Michael Meador to testify. Although Meador's affidavit does say he was willing to testify

---

[4] In pre-trial, Dinwiddie's counsel successfully prevented the admission into evidence any record of Dinwiddie's prior criminal record based on Rule 404(b) of the Federal Rules of Civil Procedure. *See* Motion to Exclude Evidence, ECF Doc. 495; Order dated Feb. 2, 2009 (denying as moot the motion to exclude after government concession on issue).

had he been subpoenaed, Meador declined to testify at his own later trial. Dinwiddie does not establish that Meador would actually have testified, and the decision to call Meador to the stand remains one of strategy, to which trial counsel is given great deference. *Payne*, 78 F.3d at 345.

Even had Meador testified as to the story presented in his affidavit, such testimony would have been impeached by other evidence available at trial. For example, Meador told his half-brother, Billy Meador, that "Dee" killed Burgos. Meador told the police an entirely different story: that unknown "Haitians" had committed the murder. Moreover, Meador's story that James alone shot Burgos is contradicted by the physical evidence, including the two differently sized shell casings found at the scene of the crime. *See* Dinwiddie Trial Transcript Vol. II, p. 127. Had Meador's testimony been admitted, the government's case against Dinwiddie would have remained overwhelming. Dinwiddie was not prejudiced by the failure to call Meador to testify. *See Ramon-Rodriguez*, 492 F.3d at 945.

The same analysis holds true for Tharpe, whose affidavit is contradicted by three sets of interviews he gave to the police during the investigation. In an interview taken April 28, 2006, Tharpe said that he had last talked to Dinwiddie on Friday April 21st or Saturday the 22nd, when Dinwiddie told him he was going to Radcliff, Kentucky to get comedy show tickets. ECF Doc. 10-2. In a second interview conducted March 12, 2007, Tharpe said that he saw Dinwiddie in

Clarksville, Tennessee on the Saturday the murder happened. ECF Doc. 10-3. The next day, Tharpe again said that he and Dinwiddie were in Clarksville, Tennessee on the day of the murder. ECF Doc. 10-4. Given the self-contradictory nature of Tharpe's versions of the events and the quantity of evidence against him, Dinwiddie was not prejudiced by the absence of Tharpe's testimony.

As for Dinwiddie's fourth ground – that he was prejudiced by the absence of defense testimony as to his state of mind – the ground fails for the same reason as the others: the desired testimony would have been impeached and would have paled in the light of the overwhelming evidence against him. Billy Meador testified that after Burgos stole $10,000 meant to purchase marijuana, Dinwiddie said he wanted to be the one to "smoke that Mexican." Trial Transcript Vol. I, p. 82–83. When Dinwiddie was told Burgos was in Missouri, he acquired a handgun, drove to that state, hid his car, and waited for Burgos in a place selected so that Burgos could not escape. He shot Burgos in the groin and then, after Burgos pleaded for his life, shot him in the head. Given the amount and quality of the evidence against Dinwiddie, he was not prejudiced by the failure of his counsel to introduce evidence that he lacked the *mens rea* for murder. *See Ramon-Rodriguez*, 492 F.3d at 945.

## IV. Certificate of Appealability

As Dinwiddie has not made a substantial showing of the denial of a federal constitutional right, I will not issue a certificate of appealability. *See Cox v. Norris*, 133 F.3d 565, 569 (8th Cir. 1997) (citing *Flinger v. Delo*, 16 F.3d 878, 882–83 (8th Cir. 1994) (substantial showing must be debatable among reasonable jurists, reasonably subject to a different outcome on appeal, or otherwise deserving of further proceedings)).

Accordingly,

**IT IS HEREBY ORDERED** that Dennis Dinwiddie's motion to vacate, set aside, or correct sentence under 28 U.S.C. § 2255 [# 1] is denied.

**IT IS FURTHER ORDERED** that that this Court will not issue a certificate of appealability, as Dinwiddie has not made a substantial showing of the denial of a federal constitutional right.

A separate Judgment in accordance with this Memorandum and Order is entered this same date.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 23rd day of September, 2014.